**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

**JOSE ACOSTA, Jr.,**

 **Plaintiff,**

**v.**              **No. 15-cv-0530 SMV/KRS**

**UNITED STATES OF AMERICA,**

 **Defendant.**

## <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

This lawsuit arose out of a collision between a Union Pacific train and a United States Army convoy truck. Plaintiff was the engineer on the train. There is little dispute over how the accident occurred or that Plaintiff was injured in the accident. The real dispute is over the nature, extent, and duration of his injuries. Plaintiff claims to have suffered significant injuries in the accident, including multiple herniated discs in his neck and back; impingement syndrome in both shoulders; meniscal tears in both knees; anxiety and depression; and chronic pain. He has undergone conservative treatment (e.g., chiropractic, physical therapy, epidural steroid injections) and has had surgeries to his lower back, shoulders, and knees. He has not worked since the accident. He claims $354,998.76 in past medical expenses; $925,333 in future medical expenses; past wage loss of $186,424; $1,832,519 in lost future earning capacity; and pain and suffering.

The case came to trial on April 18–20, 2017. Fourteen witnesses testified. The parties submitted more than 1,500 pages of exhibits. After listening to the testimony of the witnesses and reviewing the exhibits, I find that the accident was caused solely by Defendant's negligence.

I further find that some, but not all, of Plaintiff's injuries were caused by the accident. I believe the accident aggravated a pre-existing condition in Plaintiff's lower back. I find that all of Plaintiff's past medical care for the injury to his lower back is related to the accident. I will award damages for future medical care for the lower back injury, excluding the claimed need for a two-level discectomy and fusion. I believe Plaintiff suffered a temporary cervical strain in the accident, and I will award a portion his past medical expenses for that injury. I will also award damages for past and future psychological counseling.

I find that Plaintiff has not met his burden of proof with respect to the other claimed injuries. I will not award any future medical expenses for the cervical injury, nor will I award damages (past or future) for the injuries to Plaintiff's shoulders and knees. I find that Plaintiff has been disabled since the accident as a result of his lower back injury. I also find that the lower back injury, and the medications he takes for it, preclude him from returning to his prior occupation. I will award damages for lost wages and loss of future earning capacity, offset by the amount he could earn at a light duty job beginning July 1, 2017. I will also award damages for pain and suffering.

## The Testimony on Liability

On June 25, 2014, an Army truck convoy was passing through Alamogordo, New Mexico. Sgt. Jamie Klinger was driving one of the trucks. She entered a railroad crossing. The vehicles in front of her stopped for a traffic light, causing her to stop on the track. She heard the horn from an oncoming train. She pulled forward to clear the track. She and her passenger, Staff Sergeant Robinson, looked in their rearview mirrors to see whether the rear of the truck had cleared the track. They thought it had, but Sgt. Klinger wasn't sure. She felt she was as close to

the vehicle in front of her as she could get, although she conceded it was hard to tell from inside the cab of the truck. She felt she was too close to the truck in front of her to pull around it. In order to do that she would have had to back up onto the track, which she could not do without a ground guide. Neither she nor Ssgt. Robinson got out of the truck to see if it had completely cleared the track.

Amanda and Douglas Snapp were in an automobile just behind Sgt. Klinger's truck. Ms. Snapp was driving. When the truck stopped on the track, Ms. Snapp moved into the right lane and pulled forward, leaving at least a couple of car lengths for Sgt. Klinger to pull up behind her. She waved to Sgt. Klinger, trying to let her know that there was room to pull forward. Sgt. Klinger testified that she never saw Ms. Snapp waving to her.

The right front corner of the lead locomotive[1] caught the right rear corner of the truck, throwing the truck into the air. Mr. and Ms. Snapp both described the collision as "loud" and "definitely hard." Both saw the rear of the truck lifted off the ground by the collision. However, the damage to both vehicles was relatively minor.[2]

Plaintiff was the engineer operating the train. He saw the convoy crossing the tracks when the train was still a quarter of a mile away. The train was traveling at 20–30 miles per hour. Plaintiff pulled back on the throttle. When he saw Sgt. Klinger's truck stopped on the track he

---

[1] There are steps leading up to the cabin at the right front corner of the lead locomotive and a handrail by those steps. That handrail was obviously damaged in the collision, Ex. 19, as was a mirror just above the engineer's window, Ex. 21. Throughout the litigation, Defendant took the position that the handrail and mirror were the only parts of the locomotive that contacted the truck. *See, e.g.*, [Doc. 43] at 1 ("Damage to the locomotive was a broken mirror and a bent handrail."). However, photographs taken of the locomotive after the accident reflect damage to the front of the steps and the side of the locomotive. *See* [Doc. 59] at 2 ("The front wall of the locomotive[] steps was dented. There were scrapes on the side of the train body panels at the right front."). Plaintiff and the conductor, Fermin Acosta, testified that they did not remember seeing those scrapes prior to the accident. At trial Defendant's biomechanical expert, Dr. Wiechel, conceded that one point of contact was the right front corner of the exterior of the train.

[2] *See* Exs. 14–16 (photos of damage to rear of truck); Exs. 19–21 (photos of damage to locomotive).

started blowing the train's horn "excessively." He could see the truck pulling forward, but at some point he realized it wasn't going to clear the track completely. He applied the emergency brake, but the train was not able to stop in time. Plaintiff was sitting in the engineer's seat on the right side of the lead locomotive, next to a window. Believing the collision might shatter the window, he stood up and braced himself against the throttle console. He recalled that the force of the collision threw him forward, causing him to strike his left thigh on the console. He then bounced back, striking his back against the wall.

Fermin Acosta (no relation to Plaintiff) was the conductor on the train. He was sitting in a seat just a few feet away from Plaintiff. He testified that he saw Plaintiff move away from the window just before the collision. However, he did not see Plaintiff's body strike anything in the cab. He testified that he (Fermin) had lowered his head behind a console just as the accident occurred. Fermin Acosta was not injured in the accident. He felt no sudden deceleration when the train hit the truck. In fact, he did not remember any forces acting on his body whatsoever as a result of the collision. He merely remembered hearing a very loud bang, like an improvised explosive device going off.

### The Testimony on Causation

Plaintiff claims to have suffered multiple, significant injuries as a result of the collision. MRIs taken shortly after the accident revealed herniated discs in his neck and lower back, impingement syndrome in his shoulders, and meniscal tears in his knees. He has undergone multiple surgeries to his lower back, shoulders, and knees. He has not worked since the accident and claims to have significant physical limitations because of his injuries. Those limitations preclude him from returning to his job as an engineer.

Although Defendant originally seemed to be claiming that Plaintiff suffered no injuries from the collision,[3] Defendant's medical expert, Dr. Wellborn, conceded at trial that the collision probably caused Plaintiff to suffer cervical and lumbar strains. Thus, the issue is not whether Plaintiff was injured in the accident, but how badly. Much of the testimony at trial focused on this issue: Was the collision severe enough to cause the injuries Plaintiff claims?

## Plaintiff's Experts on Causation

### Dr. Freeman

Dr. Michael D. Freeman is an accident reconstructionist with ACTAR[4] certification. He has participated in the reconstruction of more than 3,000 crashes. He has studied injury biomechanics since the 1990s and has served as a consultant on injury biomechanics to NASA and the United States Congress. He is also a medical doctor. He holds a doctor of medicine degree[5] from Umea University in Sweden, a doctor of chiropractic degree from the University of Western States, and a master of public health degree from Oregon State University. He is an Affiliate Professor of Epidemiology and Psychiatry at Oregon Health and Science University and School of Medicine. He has authored 200 scholarly publications, including 60 in the field of injury biomechanics. He teaches forensic epidemiology to graduate medical students and Ph.D. candidates. He has testified as an expert in court approximately 350 times. He testified, without objection, on both general and specific causation.[6] He testified that the collision most likely caused all of Plaintiff's injuries.

---

[3] *See, e.g.*, [Doc. 59] at 5 (Defendant's Proposed Finding of Fact No. 9).

[4] ACTAR is the Accreditation Commission for Traffic Accident Reconstruction.

[5] Dr. Freeman's medical degree is not an M.D. degree; it is more akin to a degree in medical science. He is not a clinician and does not actively treat patients.

[6] Causation testimony can be divided into two categories, general and specific. *Goebel v. Denver & Rio Grande W. R.R. Co.*, 346 F.3d 987, 991 (10th Cir. 2003). General causation addresses what could have caused an injury;

Dr. Freeman based his opinions on a review of the accident reports; photographs of the accident vehicles; Plaintiff's medical records; and depositions/statements of Plaintiff and the other eyewitnesses to the accident. He also relied on epidemiologic literature which establishes that there is no "threshold" force necessary to cause injury to an individual. That is, even the routine activities of daily living can cause significant injuries similar to those suffered by Plaintiff. Dr. Freeman employed the three-step "differential diagnosis"[7] methodology cited with approval in *Etherton v. Owners Ins. Co.*, 829 F.3d 1209, 1219-1222 (10th Cir. 2016):

1. Could the event plausibly cause the injury?

2. Is there a temporal relation between the event and the injury?

3. Are there other explanations for the injury that are more probable at the same point in time?

Dr. Freeman testified that the collision was a plausible cause of Plaintiff's injuries. He did not think it was possible to reconstruct this accident using standard reconstruction methods. One of the goals of accident reconstruction and biomechanical engineering is to determine the forces applied to an occupant of a vehicle involved in the crash. To calculate those forces, an accident reconstructionist must determine the change in velocity, or "delta-v," of the plaintiff's

---

specific causation addresses what did, in fact, cause the injury. *Id.* Typically, accident reconstructionists and mechanical engineers are allowed to give opinion testimony only on general causation, and specific causation requires the testimony of a medical doctor. *See, e.g., Etherton v. Owners Ins. Co.,* 35 F. Supp. 3d 1360, 1366 (D. Colo. 2014). *But see Delgado v. Unruh*, 2017 WL 957437, at *17 (D. Kan. Mar. 13, 2017) (Dr. Freeman allowed to testify on medical causation due to his extensive knowledge and expertise), *aff'd, Etherton v. Owners Ins. Co.*, 829 F.3d 1209, 1223 (10th Cir. 2016). In any event, Defendant did not object to Dr. Freeman's qualifications to testify on specific causation.

[7] Some courts make a distinction between the terms "differential diagnosis," referring to the process of reasoning used to identify a patient's condition, and "differential etiology," referring to the process of determining the cause of that condition. *See generally* Lynch, William P., *Doctoring the Testimony: Treating Physicians, Rule 26, and the Challenges of Causation Testimony*, 33 Rev. Litig. 250, 309-318 (Spring 2014). It is clear that the Tenth Circuit was referring to causation when it used the term "differential diagnosis" in *Etherton. See Etherton*, 829 F.3d at 1221 ("This court has recognized that differential diagnosis can reliably determine causation.") (citing *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1236 (10th Cir. 2004)). Dr. Freeman preferred the phrase "injury causation analysis."

vehicle. The standard method used to calculate delta-v is based on the law of conservation of momentum. But Dr. Freeman testified that it was not possible to employ that method in this case, given (1) the difference in mass between the two vehicles, and (2) uncertainties about how the train was braking and possible slack between the cars.[8] Dr. Freeman was confronted with the fact that the train's event recorder, which records the distance the train travels in one-second intervals, shows no deceleration at the time of the accident. His response was that it is possible the train decelerated very slightly (perhaps 1-2 miles per hour) for a very short period of time (e.g., one-third to one-fifth of a second), which would not have been caught by the event recorder.

Ultimately, however, whether the collision caused the train to decelerate was not significant to his testimony because it is undisputed that Plaintiff's body was moving just prior to the collision. In Dr. Freeman's opinion, that movement—whether caused by a sudden deceleration of the train or Plaintiff's reaction to the collision—could have caused his body to strike the interior of the cab with sufficient force to cause all of his injuries.

Turning to the second question, Dr. Freeman testified that there was a temporal relationship between the collision and Plaintiff's injuries. He noted that, except for a prior injury to his right knee, Plaintiff had no pain or physical limitations prior to the accident. Plaintiff complained of thigh and low back pain immediately after the accident and began to experience pain in his neck, shoulders and knees within a few days.

---

[8] This was a major dispute between Plaintiff's expert and Defendant's expert, Dr. Wiechel. I will address that dispute when I get to Dr. Wiechel's testimony. *See also* [Doc. 41] (Plaintiff's motion to exclude Dr. Weichel's testimony).

Finally, Dr. Freeman testified that the collision was "by far . . . the most probable cause of [the] injuries." He testified that there was no "even remotely likely explanation that accounts for his injuries, other than some impact inside the train." In his opinion, the suggestion that Plaintiff's injuries all cropped up spontaneously, or that they occurred because of a degenerative process that coincidentally became symptomatic right after the collision, was so unlikely as to not be worth consideration.

**<u>Dr. Romagosa</u>**

Dr. Angelo Romagosa is a board-certified physiatrist. He has extensive experience in preparing life care plans for individuals. He reviewed all of Plaintiff's medical records and bills. He reviewed the expert reports. He also examined Plaintiff and took a detailed medical history from him. Dr. Romagosa testified, to a reasonable degree of medical probability, that Plaintiff suffered the following injuries as a result of the collision:

1. Headaches;
2. Contusion to cervical spine;
3. Contusion to lumbar spine;
4. Contusion to bilateral shoulders;
5. Contusion to bilateral knees;
6. Herniated disc at C3-C4 with radicular symptoms;
7. Herniated disc at L5-S1 with radicular symptoms;
8. Internal derangement syndrome of bilateral shoulders;
9. Internal derangement syndrome with meniscal tears of bilateral knees;
10. Related anxiety disorder/depression; and
11. Related erectile dysfunction.

Dr. Romagosa based his causation opinion on a number of factors, including: his examination of Plaintiff; his review of Plaintiff's medical records, including the MRIs; the absence of any prior medical history or history of physical complaints (except for the right knee); the temporal relationship between the collision and the beginning of Plaintiff's symptomatology; the

"consensus of opinion of the treating physicians and specialists" as reflected in the medical records; Plaintiff's reported ability to perform all the duties of his job before the collision; and his inability to work afterwards. After considering other plausible causes for the injuries (e.g., the natural aging process), Dr. Romagosa concluded that the collision was the most probable cause of Plaintiff's injuries, excluding the injury to the right knee.

**Defendant's Experts on Causation**

### Dr. Wiechel

Dr. John Wiechel has a bachelor's degree in mechanical engineering from Purdue, a master's degree in in mechanical engineering from Purdue, and a Ph.D. in mechanical engineering from the Ohio State University. While he does not appear to have any certifications in accident reconstruction or biomechanics, he has published a number of papers in both areas. He has been qualified as "an expert" in 300 to 400 cases.[9] Plaintiff did not object to his qualifications as an expert in the areas of accident reconstruction and biomechanical engineering.

Contrary to Dr. Freeman, Dr. Wiechel testified that it *is* possible to reconstruct the accident using the law of conservation of momentum. Using that methodology, he calculated the delta-v of the lead locomotive and determined that the collision caused no measurable deceleration of the train. Dr. Wiechel directly refuted Dr. Freeman's testimony that the collision might have caused the train to decelerate a couple of miles per hour for a very short period of time. Making all assumptions in Plaintiff's favor (e.g., calculating the train's delta-v using only the mass of the lead locomotive rather than the mass of the entire train), Dr. Wiechel calculated

---

[9] Although this was not made clear at trial, I assume this means he was allowed to testify as an expert in the areas of accident reconstruction or biomechanical engineering. I infer this from the context of the question asked by Defendant's counsel, and the fact that Plaintiff's counsel stipulated to his qualifications as an expert in those areas.

that the forces acting on Plaintiff's body in the cab (beyond those caused by the braking of the train) would have been no more than .02g–.025g. He explained that this amount of deceleration is one third to one fourth of what a driver would experience if he were driving down the road at 30 miles per hour and took his foot off the accelerator. Dr. Wiechel concluded that "there is no physical explanation for this impact causing the motions that [Plaintiff] describes. Any kind of motion that he would have in the range of what he's describing has to come from something other than the impact . . . of the train into the truck."

He was asked on cross-examination about other plausible explanations for Plaintiff's movement within the cab. He felt there was no other plausible explanation. He testified that there were only two *possible* explanations for Plaintiff's movement inside the cabin: Either Plaintiff intentionally threw his body against the interior of the cabin, or someone else grabbed him and threw him. Dr. Wiechel did not examine these possibilities because he considered them to be implausible.

### Dr. Wellborn

Dr. William Wellborn is a physician. He is board-certified in physical medicine and rehabilitation. He has extensive experience evaluating patients who have been involved in work-related accidents. He is a Clinical Assistant Professor at the University of Texas Health Science Center in San Antonio, Texas. Although I believe he was called primarily as an expert witness on damages, I will briefly address his testimony here because it did touch on causation.

Dr. Wellborn conceded that Plaintiff was, in fact, injured in the accident. He believes Plaintiff suffered neck and lower back strains—and nothing more—as a result of the collision. He expressly agreed that the emergency room ("ER") visit at Gerald Champion Memorial

Hospital and six subsequent chiropractic visits were necessary and reasonable treatment for the injuries Plaintiff incurred in the accident.

Dr. Wellborn conceded that the radiologic studies showed injuries to Plaintiff's neck, lower back, shoulders, and knees. But he disputed that those findings were caused by the collision. He suggested that virtually all of the medical treatment was the result of overtreatment on the part of Plaintiff's doctors. He believes that Plaintiff could have (and should have) returned to work without restrictions after a few chiropractic visits. He based this opinion on his own experience treating patients with back pain, as well as conversations he's had with chiropractors.

## The Testimony on Damages

### Plaintiff's Medical Records

There is no dispute that Plaintiff has undergone extensive medical treatment since the accident. I will summarize the course of his treatment here.

Plaintiff was transported by ambulance to the emergency room of Gerald Champion Medical Center in Alamogordo shortly after the accident. His main complaints were left thigh pain and bilateral lumbar pain. He described moderate, stabbing pain radiating down into his legs.[10] X-rays revealed no fracture or other bony abnormality.[11] The ER physician's diagnoses were lumbar strain, left thigh contusion, and contusion of the back. He prescribed pain relievers (Children's Tylenol, Motrin, and Tylenol #3) and discharged Plaintiff to home.

Plaintiff's symptoms did not abate. He saw Dr. Stephen Untersee, a chiropractor, on June 27, 2014, complaining of pain in his left leg, right knee, shoulders, back, and neck. He

---

[10] Ex. 22, p. 19.
[11] *Id.*, p. 33.

described the pain as burning, aching, and radiating.[12] He rated the severity of the pain as eight out of ten. He reported no prior history of any problems with his neck or back.[13]

Dr. Untersee ordered cervical and lumbar MRIs. The MRIs were taken on July 1, 2014. The cervical spine MRI[14] revealed that vertebral body height and alignment of C1 through C7 were maintained, and the paravertebral soft tissues were unremarkable. Small disc herniations at C2-C3 and C3-C4 were noted, with no significant neural foraminal narrowing.[15] The lumbar MRI[16] revealed normal vertebral body height and alignment of L1 through L5, and unremarkable paravertebral soft tissues. While there was no significant spinal canal stenosis[17] or neural foraminal narrowing at L1 through L5, the report noted a small disc herniation at L5-S1 which "flattened the right thecal margin and contributed to moderate right and mild left neural foraminal narrowing."[18]

On July 7, 2014, Dr. Untersee issued a progress report to Union Pacific. He expected to release Plaintiff to full duty by July 28, 2014. In the meantime, he placed a number of restrictions on him, including only occasional lifting and carrying up to five pounds; no overhead lifting or climbing; and limited bending/twisting, kneeling/squatting, walking/standing, and sitting. Plaintiff continued to attend chiropractic therapy treatments with Dr. Untersee from June 27, 2014 through February 9, 2015.

---

[12] Ex. 23, p. 5 ("[low back] . . . aches . . . pain radiates [to right] knee").

[13] *Id.*, pp. 2–6.

[14] *Id.*, p. 23.

[15] The foramen is the opening between the vertebrae through which spinal nerve roots travel and exit to other parts of the body.

[16] Ex. 23, p. 24.

[17] Stenosis is the abnormal narrowing of a passage in the body.

[18] Ex. 23, p. 24.

On July 9, 2014, Plaintiff saw Dr. Dean Smith, an orthopedic surgeon, complaining of acute and chronic neck and back pain.[19] Dr. Smith reviewed the MRIs and examined Plaintiff. He did not feel he was a surgical candidate at that time. He prescribed Medrol (a steroid used to treat inflammation), Neurontin (an anti-epileptic medication that is used to treat nerve pain), and continued chiropractic therapy with Dr. Untersee. He also suggested a trial epidural injection if the symptoms did not improve with conservative treatment. He ordered Plaintiff to remain off work through September 1, 2014.

On July 15, 2014, Plaintiff saw a counselor, Grecia Garcia, M.A., L.P.C., for anxiety, sense of numbing, detachment, recurrent images of the accident, flashbacks, poor concentration, hypervigilance, restlessness, and difficulty sleeping.[20] She performed a psychological evaluation and diagnosed acute stress disorder. Ms. Garcia recommended further counseling in individual psychotherapy sessions, which Plaintiff attended every 45 days.

Plaintiff complained of bilateral knee pain to Dr. Untersee. Dr. Untersee ordered MRIs of both knees. They were taken on July 18, 2014.[21] Those MRIs showed tears of the medial meniscus in both knees. Plaintiff had experienced problems with his right knee prior to the accident. He had consulted Dr. Thomas Alost, an orthopedic surgeon, in July of 2013 for complaints of pain and instability in the knee. Dr. Alost ordered an MRI, which revealed a tear in the posterior horn of the medial meniscus. Dr. Alost recommended arthroscopic surgery to repair the tear. However, Plaintiff chose instead to manage the injury conservatively. Plaintiff testified that he had no problem with his left knee before the accident.

---

[19] Ex. 26.
[20] Ex. 27.
[21] Ex. 25.

Plaintiff returned to Dr. Alost on July 29, 2014. He examined both knees and reviewed the recent MRIs ordered by Dr. Untersee. After conservative treatment was unsuccessful, he performed arthroscopic surgery on both knees: the right knee on September 5, 2014, and the left knee on December 4, 2014.

On August 4, 2014, Plaintiff saw Dr. Jose Luis Villareal, a pain specialist, for ongoing complaints of shoulder, neck, arm, and leg pain.[22] He reported burning, stabbing pain in his neck which radiated into both arms. The pain in the lower back radiated down both legs. Plaintiff rated his pain as 10/10 at worst; 3/10 at best; and 6/10 on average, despite the fact that he was already taking Tramadol (an opioid pain medication), Celebrex (an NSAID), and Tizanidine (a muscle relaxant). Dr. Villareal performed a thorough physical examination and reviewed the cervical and lumbar MRIs taken on July 1, 2014. He noted the multiple disc herniations and the "foraminal stenosis"[23] at L5-S1. His diagnoses included myalgia, lumbosacral neuritis, displacement of lumbar disc with myelopathy,[24] neck disorders, and cervical disc displacement without myelopathy. Dr. Villareal continued Plaintiff on the medications and encouraged him to lose weight and exercise. He scheduled a follow-up visit in one month, at which time he would consider epidural steroid injections if Plaintiff's symptoms did not improve.

On August 11, 2014, Plaintiff saw Dr. Stephen Esses, an orthopedic surgeon.[25] He complained of neck and back pain with radiation, numbness, and tingling in all extremities.

---

[22] Ex. 31.
[23] "Foraminal stenosis" is another way of saying "foraminal narrowing." *See supra* nn. 15, 17. Foraminal stenosis can cause pain, numbness, tingling, and sciatica, i.e., pain that radiates down the arm or leg.
[24] Myelopathy is a disease or disorder of the spinal cord, usually from compression. An inflammation of the spinal cord is typically referred to as myelitis.
[25] Ex. 36.

Dr. Esses examined Plaintiff[26] and reviewed the July 12, 2014 MRIs. He recommended proceeding with the cervical epidural steroid injection. Dr. Villareal administered the cervical injection on September 3, 2014, but Plaintiff only experienced transient relief from the treatment. In a follow-up visit with Dr. Esses on September 18, 2014, Dr. Esses ordered cervical EMG studies. The EMGs "showed no evidence of a cervical radiculopathy on either side."[27] In other words, there was nothing in the EMGs to explain Plaintiff's cervical pain or the numbness and tingling in his arms. In view of the EMGs, Dr. Esses recommended against surgery to Plaintiff's neck.

On October 27, 2014, Plaintiff saw Dr. Barry Cromer, complaining of pain in his neck, back, and bilateral shoulders. After a physical examination and review of the MRIs, Dr. Cromer diagnosed Plaintiff with disorder of bursa, cervicalgia, cervical sprain, lumbar sprain, lumbago, and pain in joint involving the shoulder region. Dr. Cromer recommended treatment with prescription medication (including Tylenol with codeine) and physical therapy.

On November 18, 2014, MRI diagnostic studies were performed of Plaintiff's right and left shoulders. They revealed bilateral bursitis (inflammation of the soft tissues) but no rotator cuff tears.[28] On December 23, 2014, Plaintiff followed up on his medical treatment for ongoing complaints in his left and right shoulders under the care of Dr. Alost. Dr. Alost ordered another round of physical therapy and administered steroid injections to Plaintiff's right and left shoulder

---

[26] One of the tests Dr. Esses performed was the straight-leg raising (SLR) test, which is used to determine whether one or more of the nerve roots leading to the sciatic nerve may be compressed or irritated. When the test is positive, the patient feels pain down the back of the leg below the knee. Dr. Esses' office note dated August 11, 2014, states that Plaintiff had "*back* pain with straight-leg raising." Ex. 36 (emphasis added). I interpret this as a negative result.
[27] The EMG on the left arm was abnormal, but that reflected a prior nerve injury Plaintiff had incurred when he broke his left arm in a basketball game. *See* Ex. 23, p. 44. The EMG did not suggest nerve impingement caused by the disc herniations at C2-C3 and C3-C4.
[28] Ex. 23, pp. 33–35.

joints. After the shoulder symptoms failed to subside, Dr. Alost recommended surgery. On November 12, 2015, he performed arthroscopic surgery to Plaintiff's right shoulder, followed by arthroscopic surgery of his left shoulder on April 21, 2016.

On February 5, 2015, Plaintiff saw Dr. Helson Pacheco-Serrant, a neurosurgeon, for chronic neck and back pain.[29] He complained of neck pain radiating to his upper extremities with associated symptoms of numbness and tingling. He rated the severity of the pain as 6/10. Dr. Pacheco-Serrant diagnosed Plaintiff with a cervical disc herniation at C3-C4. Because physical therapy and epidural steroid injections had failed to provide relief, Dr. Pacheco-Serrant has recommended surgical intervention for his cervical spine in the form of a two-level cervical disc fusion. To date, Plaintiff has not undergone neck surgery.

On February 10, 2015, Plaintiff presented to Dr. Villareal for continued pain management treatment. He noted Plaintiff reported pain to palpation at L5-S1. Significantly, Dr. Villareal also noted positive results on straight-leg raising tests (lying and sitting), bilaterally. His diagnoses included "neuritis, lumbosacral as deteriorated," and "displacement, lumbar disc [without] myelopathy as unchanged." He scheduled Plaintiff for lumbar transforaminal epidural steroid injections, which he administered on April 29, 2015.[30]

The injections provided only temporary relief. On May 7, 2015, Plaintiff returned to Dr. Pacheco-Serrant complaining of back pain with radiation to the lower extremities and tingling, numbness, and weakness of the left side. He reported that these symptoms had persisted since the day of the accident. Dr. Pacheco-Serrant noted that conservative treatment had failed, and that the lumbar epidural steroid injections had provided relief for only three days. He

---

[29] Ex. 42.
[30] Ex. 32.

diagnosed "herniated disc at L5-S1 [with] nerve impingement," and recommended lumbar surgery. He performed a posterior lumbar decompression surgery at L5-S1 with posterolateral fusion on May 22, 2015. Following the back surgery, Plaintiff reported some relief from the surgery. By August 6, 2015, he rated his pain at 2/10, although he was still experiencing dull, achy pain radiating into the legs. On March 22, 2016, Plaintiff reported continuing back pain with radiation, which he rated at 3/10.

**Plaintiff's Witnesses on Damages**

### Dr. Romagosa

Dr. Romagosa testified that all of Plaintiff's medical care, except for that related to the right knee, was necessary as a result of the accident. He also testified that the charges for the medical care were reasonable, except for two charges for genetic testing, whose value he reduced.

Dr. Romagosa also prepared a life care plan for Plaintiff. A life care plan addresses the future medical care requirements of an injured person and calculates the present value of such care. Defendant did not object to Dr. Romagosa's qualification to prepare such a plan. Dr. Romagosa opined that Plaintiff would need a vast amount of medical care in the future, including a two-level lumbar discectomy and fusion. Dr. Romagosa calculated the present-day cost of Plaintiff's future medical care to be $814,233.43.[31]

---

[31] Dr. Romagosa did not estimate the future cost of the medical care and reduce that figure to present value. Plaintiff's economic expert, Dr. McCoin, was retained to do that. Dr. McCoin calculated the present value of the medical care to be *higher* than Dr. Romagosa's figure, the opposite of what would be expected. It is assumed that any monetary award would, if properly invested, earn interest. *See* UJI 13-1822 NMRA. Economists commonly use the return on government bonds as the benchmark for a "safe" investment. But as Dr. McCoin explained, the cost of certain medical expenses is expected to increase faster than the historic return on government paper.

Dr. Romagosa also testified, over Defendant's objection, to Plaintiff's physical limitations. Of significance to my decision, Dr. Romagosa opined that based on the lumbar fusion surgery alone, Plaintiff should find a job that allows for alternate sitting, standing, and walking, and that limits lifting to no more than 20 pounds occasionally.[32]

### Dr. Quintanilla

Dr. William L. Quintanilla is a vocational rehabilitation counselor. He has a master's degree in counseling and guidance. He has extensive experience in the field of vocational rehabilitation. He testified, without objection, as an expert in that field.

Dr. Quintanilla performed a vocational evaluation of Plaintiff using the physical limitations set by Dr. Romagosa, in particular, the 20-pound lifting restriction.[33] That lifting restriction limits Plaintiff to the "light" category of work. It precludes him from returning to his position at the railroad, because that job required him to "assist in the movement of weights of up to 84 to 87 pounds (rarely)."[34] Dr. Quintanilla testified that Plaintiff cannot return to any of the jobs that he's done in the past as a "train man." Dr. Quintanilla also opined that none Plaintiff's acquired skills would transfer to other jobs for which he is physically suited. Based on Plaintiff's

---

[32] Dr. Romagosa testified that Plaintiff has a number of other restrictions based on his shoulder and knee injuries. For example, the knee problems preclude him from jobs that would require him to climb ladders, walk on uneven surfaces, or jump down any significant distances.

[33] Dr. Quintanilla testified that the 20-pound lifting restriction is common for patients who have undergone low back fusion surgery.

[34] *See* Union Pacific Railroad Locomotive Engineer Job Description Brief, Ex. K. There was a great deal of testimony about those 84 to 87 pounds. That is the weight of a "knuckle," which I understand to be part of the mechanism that connects the train cars. Those knuckles occasionally break. The engineer and conductor will drop a replacement knuckle off the train, pull the train forward so that the broken knuckle is even with the replacement, remove the broken knuckle, and then install the replacement. Plaintiff testified that, in practice, the engineer is expected to lift the knuckle by himself to drop it off the train. Defendant's counsel tried to emphasize that the job description for an engineer provides only that the engineer must be able to *assist* in lifting 84 to 87 pounds. In other words, the engineer is not expected to be able to lift 84 to 87 pounds on his own. The point of the argument seems to be that an engineer with a lifting restriction could say to the conductor, "OK, you lift 67 pounds, and I'll only lift 20 pounds." I find that argument to be unpersuasive.

background, education, and the fact that he is restricted to light-duty work, Dr. Quintanilla believes that he is suited only for jobs such as security gate tender, surveillance systems monitor, warehouse clerk, counter rental clerk, office helper, telemarketer, or small package courier. In the Las Cruces/El Paso area, those types of jobs offer entry-level wages of approximately $18,000 per year.

Evidence was introduced that the Union Pacific Railroad had notified Plaintiff of a job opening[35] for a security officer position in Santa Rosa, New Mexico. Plaintiff lives in Anthony, New Mexico, which is approximately 265 miles from Santa Rosa. Dr. Quintanilla testified that Plaintiff is not suited for that job because he must occasionally take strong pain medications (e.g., Tramadol and hydrocodone). Union Pacific's personnel rules apparently preclude the hiring of anyone who takes such medications.[36]

**Dr. McCoin**

Dr. Kenneth McCoin is an economist. He holds a bachelor's degree and a Ph.D. in economics and finance from the University of Houston. He also holds a chartered financial analyst (CFA) certificate. He was asked to calculate Plaintiff's past wage loss and loss of future earning capacity. He was also asked to calculate the present value of the cost of Plaintiff's future medical care as outlined in Dr. Romagosa's life care plan. Defendant did not object to Dr. McCoin's qualifications to provide expert testimony on these issues.

---

[35] There was conflicting evidence regarding whether that position was actually offered to Plaintiff. Defendant's counsel repeatedly referred to it as a "job offer" which Plaintiff had "rejected." *See* [Doc. 59] at 5 ("The Plaintiff was offered a job by the Union Pacific Railroad corresponding to the alleged limitations needed by the Plaintiff at a salary commensurate with the position, which he rejected."). Plaintiff testified that he was never offered the job. He was simply notified that a position was available and that he was free to apply for it. He chose not to apply for the position because he did not want to uproot his family. Plus, he is still taking narcotic pain medications which would preclude him from taking that job—or, apparently, any job—at Union Pacific.

[36] I do not believe the actual personnel policy was introduced as an exhibit at trial. However, both Dr. Quintanilla and Plaintiff testified about it, and Defendant offered no evidence to rebut their testimony.

Plaintiff earned $90,544 in 2013, the year before the accident. He has not worked since the accident. Dr. McCoin calculated his net past lost wages at $186,424.

In calculating Plaintiff's lost earning capacity, Dr. McCoin assumed that Plaintiff would return to work on July 1, 2017 at an entry-level job. He assumed that the job would pay $10 per hour, or $20,800 annually. He also assumed that Plaintiff had a work-life expectancy of 22.4 years. Using those assumptions, he calculated the present value of Plaintiff's loss of earning capacity to be $1,832,519.

With respect to the present value of future medical expenses, Dr. McCoin started with the $814,233 reflected in Dr. Romagosa's life care plan. He calculated the present value of that medical care to be $925,333.[37] Defendant did not cross-examine Dr. McCoin.

### Enrique Guerra

Mr. Guerra is a conductor for the Union Pacific Railroad. He has known and worked with Plaintiff since 2001 or 2002. He testified that he never observed Plaintiff to have any difficulties with the physical requirements of his job prior to the accident. Before the accident Guerra played basketball with Plaintiff, sometimes up to three times a week. Plaintiff was always "one of the top players out there." Mr. Guerra and Plaintiff also coached their sons in Pee-Wee football and basketball. Plaintiff never complained of, or exhibited signs of, any physical limitations prior to the accident. Nor did he ever seem to be in pain.

Mr. Guerra has not seen Plaintiff work, play basketball, or coach any sport since the accident. On the few occasions when Mr. Guerra has seen Plaintiff since the accident, he has

---

[37] *See supra* n. 31 (regarding why Dr. McCoin's figure is higher than Dr. Romagosa's).

looked and walked like he was in pain. He also looked "a little depressed, maybe sad. . . . He just didn't look the same to me. He wasn't the confident Joe that I knew."

### Elvia Antunez

Ms. Antunez is Plaintiff's sister. She testified that Plaintiff was physically active prior to the accident. He played in basketball tournaments with her 21-year-old son. He would go four-wheeling and off-roading with his family. He would perform work around the house. He attended church regularly and stayed for the entire service. To her knowledge, Plaintiff had no physical complaints prior to the accident.

Since the accident he is no longer active. He does not play sports or go four-wheeling. He can no longer perform yard work around the house. And though he still attends church, he often leaves early because he cannot sit for very long. She also testified that "his moods are different. He's just not the same."

### Stephanie Acosta

Stephanie Acosta is Plaintiff's wife. They have been married for 15 years. They have two sons. One is ten years old. The other is 12. They own a 3400-square-foot house on one and one third acres in Anthony, New Mexico.

Ms. Acosta testified that prior to the accident Plaintiff was "in good shape and strong." While Ms. Acosta, a stay-at-home mom, would handle the indoor chores, Plaintiff handled all the yard work. He also performed maintenance work on the house, including carpentry, tiling, drywall patching, painting, and installing shelves. He played basketball frequently with his sons and his friends. She never observed him show any signs of pain or other physical limitations. He

was also very active with their two sons. He played sports with them, took them four-wheeling, coached them in sports, and took them camping.

All of that has changed since the accident. Plaintiff is no longer able to perform any chores around the house. His nephew helps, but if he can't do something, Ms. Acosta and her sons must do it. Plaintiff has not played sports or taken his sons four-wheeling since the accident. He sold his four-wheeler. He no longer coaches them in sports. Plaintiff's back pain makes it impossible for them to enjoy camping or car trips. He has difficulty sleeping. Whereas they used to sleep in the same bed, since the accident Plaintiff has had to sleep in a separate adjustable bed. Their intimacy has diminished. Plaintiff takes pain medications, which he did not do before the accident. His mood has changed. While he used to be "very engaged," proud of being a good father and provider, he is now depressed, irritable, and lacks confidence.

**Plaintiff Jose Acosta**

Plaintiff is 41 years old. His father and grandfather worked for the railroad. He began working for the Union Pacific Railroad in 1998. He started as a switchman. He was promoted to brakeman, then conductor, and then engineer. He never had a work-related accident prior to this one. He loved his job and felt secure, established, and "proud to follow in the family legacy." He earned $90,504 in 2013.

Plaintiff was physically fit and active prior to the accident. He played basketball frequently. He played and coached other sports with his sons. He took his family four-wheeling and on extended camping trips. He did all the yard work around the house. He was able to perform all the duties of his job at the railroad.

He did testify about two prior injuries. He fell and broke his left arm in a basketball game several years before the accident. That injury required surgery, including placement of two plates and 13 screws. He had also seen Dr. Alost, the orthopedic surgeon, for pain in his right knee prior to the accident. Dr. Alost recommended arthroscopic surgery to repair a torn meniscus and internal derangement. Plaintiff declined the surgery, opting instead for conservative treatment, including strengthening exercises, icing, and rest. There was no evidence that either of these prior injuries caused any chronic pain or physical restriction prior to the accident. It was undisputed that Plaintiff played in a basketball game just a few days before the accident. By all accounts he played the game well and without incident.

Plaintiff testified about his medical treatment. I've already addressed that at some length, so I won't go through it in detail again. Briefly, Plaintiff immediately felt he had been injured in the accident, at least seriously enough to get checked out in the emergency room. The ER doctor took x-rays and found no indications of a serious injury. He released Plaintiff with instructions to rest and take anti-inflammatories if necessary.

Plaintiff didn't get better. Within a few days of the accident he was experiencing pain in his neck, shoulders, lower back, and knees. His physicians ordered MRIs, which revealed herniated discs in his neck and lower back, impingement syndrome in both shoulders, and torn meniscuses in both knees. Conservative treatment (chiropractic, physical therapy, injections) didn't help. He ended up undergoing surgeries to his lower back, both shoulders, and both knees. Although his surgeon has recommended neck surgery, he has declined. The surgeries have reduced his symptoms somewhat, but he still has significant pain in his neck and lower back. He takes strong pain medications (hydrocodone and Tramadol) and muscle relaxants routinely,

although not daily. His physicians have placed physical limitations on him that preclude him from returning to work at Union Pacific.

He testified at length about the physical requirements of his job as an engineer. He is no longer able to perform that job for a number of reasons. First, the job description requires the ability to "assist in lifting 84 to 87 pounds (rarely)." He testified that this requirement refers to the occasional need for the engineer to assist in replacing broken "knuckles," which weigh either 84 or 87 pounds. There are only two employees on a train, the conductor and the engineer. Thus, the reference to "assisting" in the lifting of 84 to 87 pounds means the ability to lift 42 to 43.5 pounds, i.e., half the weight of a knuckle. Plaintiff cannot lift more than 20 pounds. Plus, he testified that, in practice, engineers actually have to lift and carry the knuckle by themselves. Either way, he could not meet that requirement.

In addition, Union Pacific personnel rules preclude the hiring of anyone taking narcotic pain medications. He still occasionally takes hydrocodone and Tramadol. This alone would preclude him from returning to his old job as an engineer.

Plaintiff also testified about the posting for a security officer in Santa Rosa. He did not apply for that job for a number of reasons. It would have required him to sell his house and move from Anthony to Santa Rosa (about 265 miles). He would have had to pull his children out of school and leave his church congregation. Plus, the same restriction regarding pain medications would have applied to that job as it did to his prior job.

He testified that he has been working with a job counselor to find a job in the El Paso/Anthony area that would accommodate his physical limitations. He has sent out approximately 30 job applications, thus far without success.

The accident has affected his life in many other ways. He has had nightmares and flashbacks of the accident. He has not played sports with his friends or his sons since the accident. He is no longer able to coach his sons in sports or take them four-wheeling or camping. He cannot sit for more than 45 minutes at a time, which interferes with his ability to attend church. His intimacy with his wife has diminished. He has lost self-esteem, as he no longer feels he is providing for his family. He has caught himself taking out his frustrations on his wife and kids.

### **Defendant's Witnesses on Damages**

#### **Dr. Wellborn**

Dr. Wellborn testified that Plaintiff suffered only minor neck and back strains as a result of the accident. He believes that none of the medical treatment reflected in the records—with the exception of the ER visit and six chiropractic visits—was caused by the accident. He conceded that there were positive findings in the MRIs taken of Plaintiff's neck, shoulders, knees, and back after the accident. However, he does not believe the MRIs were indicated, even though the results were undeniably abnormal. He does not believe the surgeries were justified because the surgeons (he believes) based their decisions to operate solely on the MRI findings. He believes the surgeons fell below the standard of care by not performing (or at least by failing to document) certain diagnostic tests, (e.g., range of motion, straight-leg raising), to confirm that the abnormalities reflected in the MRIs were, in fact, causing Plaintiff's symptoms. Again, Dr. Wellborn did not dispute the abnormal MRI findings. But he disputes that those findings reflect injuries caused by the accident or that the surgeries were justified based on the MRI findings alone.

In summary, Dr. Wellborn testified that Plaintiff suffered nothing more significant than neck and low back strains as a result of the accident. He believes that the one ER visit and six chiropractic visits were the only medical treatment necessary as a result of the accident.

### Janet Toney

Ms. Toney is a certified life care planner and certified rehabilitation consultant.[38] Defendant offered her expert report in lieu of calling her as a live witness. Plaintiff did not object.

Ms. Toney was hired to critique Dr. Romagosa's life care plan. She reviewed a large volume of materials pertaining to the case.[39] However, she based her opinions primarily on Dr. Wellborn's report dated September 6, 2016.[40] Because Dr. Wellborn opined that none of Plaintiff's injuries (other than temporary neck and back strains) was caused by the accident, and that Plaintiff could have returned to work immediately after the accident with no restrictions, she concluded that Dr. Romagosa's life care plan was totally invalid.[41] In other words, Ms. Toney opined that Plaintiff had no need for future medical costs as a result of the accident.

### My Findings and Conclusions

### Liability

The Federal Tort Claims Act waives the United States' sovereign immunity for injuries caused by the negligent act or omission of a federal government employee acting in the course and scope of her employment. 28 U.S.C. § 1346(b). Under the Act, the United States is liable to the same extent as a private individual under like circumstances. *Id.* § 2674.

---

[38] *See* Ms. Toney's Expert Report dated September 6, 2016, Ex. L.
[39] *Id.*
[40] *Id.* at 2.
[41] *See* Response Life Care Plan attached as exhibit to Ex. L.

It is the duty of every operator of a vehicle to exercise ordinary care, at all times, to prevent an accident. UJI 13-1201 NMRA. Ordinary care is that care which a reasonably prudent person would use in the conduct of the person's own affairs. UJI 13-1603 NMRA. It is the duty of every driver of a vehicle to exercise ordinary care in approaching, entering, and driving through an intersection. UJI 13-1204 NMRA. A failure to act constitutes negligence if it is a failure to do an act which one is under a duty to do, and which a reasonably prudent person, in the exercise of ordinary care, would do in order to prevent injury to her or to another. UJI 13-1601 NMRA. Sgt. Klinger breached her duty to exercise ordinary care by failing to clear the railroad crossing in time to avoid the collision.

Sgt. Klinger's conduct also constitutes negligence per se. Alamogordo has adopted the 2010 New Mexico Uniform Traffic Ordinance, including ordinance § 12-6-7.5, which states:

> 12-6-7.5 Railroad-Highway Grade Crossing Violations—All Drivers.
>
> A person driving a vehicle approaching a railroad-highway grade crossing shall . . .
>
> (3) proceed through the railroad-highway grade crossing only if it is safe to completely pass through the entire railroad-highway grade crossing without stopping.[42]

Sgt. Klinger violated § 12-6-7.5. The law required her to make sure there was enough room for her vehicle to completely clear the tracks before she entered the crossing. This she failed to do. Because she violated the ordinance, her conduct constitutes negligence as a matter of law. UJI 13-502 NMRA.

---

[42] Alamogordo, N.M., Rev. Ordinances ch. 24, art. I, § 24-01-010.

The collision was caused solely by Sgt. Klinger's negligence. I find no comparative negligence on the part of any other person or entity.[43]

## **Causation**

A party seeking a recovery has the burden of proving all the essential elements of his claim by a preponderance of the evidence. UJI 13-304 NMRA. The standard requires only that Plaintiff convince me that something is more likely true than not true. *Id*. I reviewed the exhibits (especially the medical records) prior to trial. I listened to the testimony, paying particular attention to the credibility of each witness. I later reviewed the testimony of the experts and reviewed the medical records more closely. I find that Plaintiff has met his burden of proving by a preponderance of the evidence that the accident caused him to suffer injuries to his lower back and neck. He has convinced me that all past and future medical care related to the lower back injury is related to the accident, excluding the claimed need for a two-level discectomy and fusion in the future. I am also convinced that the accident caused Plaintiff to suffer a cervical strain requiring chiropractic treatment. However, I find that none of the other treatment Plaintiff received for his cervical injury was related to the accident. Nor am I convinced that the injuries to Plaintiff's knees and shoulders are related to the accident.

I am not convinced the accident happened the way Plaintiff remembers it. I do not believe the force of the collision threw him about the cabin. There was simply too much evidence that contradicted Plaintiff's memory: The train recorder showed no sudden deceleration;[44] Dr. Wiechel testified that his reconstruction of the accident showed no sudden deceleration; Dr. Freeman testified that, at best, the locomotive decelerated 1–2 miles per hour for less than a

---

[43] *See generally* State of New Mexico Uniform Crash Report, Ex. 1, p. 2 of 4 (Apparent Contributing Factors).
[44] *See* Ex. F.

second; and Fermin Acosta (the conductor) testified that he felt no forces acting on his body as a result of the accident.

And yet even Dr. Wellborn agreed that Plaintiff was injured by the collision; *something* happened to cause injuries to his neck and lower back.[45] I am convinced that something happened as well. I simply do not believe that that "something" was a sudden and dramatic deceleration of the train. Based on the testimony of Dr. Freeman, Plaintiff, and Fermin Acosta, I am convinced by a preponderance of the evidence that Plaintiff reacted to the impending collision. I believe he moved from his seat, braced himself for the impact, and then when the impact occurred he reacted to it, causing his body to strike the interior of the cabin. This is consistent with Fermin Acosta's testimony that he saw Plaintiff moving just before the accident. And although Plaintiff testified that he felt as if he was thrown into the console by the force of the collision, he conceded that it was a terrifying event that happened very quickly, and that he really couldn't say what caused his body to move.

Dr. Freeman testified that it doesn't matter whether the movement of Plaintiff's body was caused by the collision or his reaction to it; what matters is whether he struck the interior of the cab hard enough to cause an injury. That testimony made sense to me. I am convinced, by a

---

[45] I will admit I find it hard to reconcile Dr. Wellborn's testimony with that of Dr. Wiechel. Dr. Wiechel seemed to be saying:
- The impact did not impart enough force on the train to cause Plaintiff's body to move.
- There is no other plausible explanation for why his body might have moved.
- Therefore, his body didn't move.

In other words, nothing happened inside the cabin that could possibly explain Plaintiff's injuries. But Dr. Wellborn seemed to concede that *something* happened—something that was sufficiently traumatic to strain Plaintiff's neck and back, but not traumatic enough to cause more serious damage. Dr. Wellborn was never asked to explain this inconsistency or how he determined that a force strong enough to cause Plaintiff to strain his neck and back could not have caused his other injuries. He expressly stated that he was not "relying on the forces [from] the impact to come to [his conclusions]."

preponderance of the evidence, that Plaintiff's body struck the interior of the cab as a result of his reaction to the accident.

I do not believe that Plaintiff struck the interior of the cab hard enough to cause the disc herniations, the impingement syndrome in both shoulders, and the meniscal tears to both knees. Dr. Freeman testified that the chance of all these injuries occurring spontaneously and without significant trauma was highly unlikely. But it would seem to me equally unlikely that all those injuries could have been caused by a collision that left little to no visible evidence of trauma, a collision that wasn't even *felt* by someone sitting three feet away from Plaintiff.

For the following reasons, I believe that the collision aggravated a pre-existing disc herniation in Plaintiff's lumbar spine at L5-S1. There was absolutely no evidence introduced at trial suggesting that Plaintiff suffered lower back pain prior to the accident. At the ER he complained of low back pain radiating into his legs. And he consistently complained of radicular pain, numbness, and tingling in the legs thereafter. An MRI revealed a disc herniation with foraminal narrowing at L5-S1. Subsequently, at least two physicians—Dr. Untersee[46] and Dr. Villareal[47]—obtained positive results on the straight-leg raising test (although other doctors did not obtain similar results).[48] All of this strongly suggests some sort of nerve impingement. And then Dr. Pacheco-Serrant observed "very severe instability" and stenosis at L5-S1 when he performed the lumbar fusion. Thus, we have no evidence of radicular pain before the accident; immediate—and consistent—complaints of radicular pain after the accident; an MRI suggesting a cause for the radicular pain; and then intraoperative findings that explained the source of the

---

[46] *See, e.g.*, Ex. 23, p. 77 ("Straight Leg Raiser is positive . . . bilaterally with pain radiating to . . . left posterior thigh."). Dr. Untersee obtained similar positive results on almost every office visit. *See generally id.*, pp. 71–377.
[47] *See* Ex. 31, p. 3.
[48] *See, e.g.*, Dr. Esses' note dated July 9, 2014, Ex. 28, p. 3 ("Straight leg raise is negative bilaterally.").

radicular pain. Based on that evidence, as well as Dr. Romagosa's expert testimony, I am convinced by a preponderance of the evidence that Plaintiff had a pre-existing L5-S1 disc herniation that was aggravated by the collision. Under New Mexico law the defendant must "take the plaintiff as he finds him." UJI 13-1802 NMRA*; Salopek v. Friedman*, 2013-NMCA-087, ¶¶ 16–23, 308 P.3d 139. Thus, Defendant is liable for all damages flowing from that aggravation of a pre-existing condition.

I am further convinced that the lower back problems and lumbar fusion place restrictions on Plaintiff that prevent him from returning to his prior position as an engineer with Union Pacific.[49] I accept the testimony that he could return to light duty work, and in calculating damages I have assumed he would find such work beginning on July 1, 2017. I am also convinced that he will need some future medical care as a result of the lower back injury.

The neck is a different story. I agree with Dr. Wellborn that Plaintiff most likely suffered a cervical strain in the collision. Plaintiff did start to complain of cervical pain not long after the accident. But while the cervical MRI revealed disc herniations, it showed no foraminal narrowing or other evidence of nerve impingement. Subsequent EMGs failed to reveal any nerve root involvement. Thus, in contrast to the situation with his lower back, there is no explanation for Plaintiff's continuing complaints of radicular pain, numbness, and tingling in his arms. Put another way, even if it were assumed that the disc herniations were caused by the accident (and I am not convinced they were), there is nothing other than Dr. Romagosa's conclusory testimony tying Plaintiff's symptoms to the herniations. In short, Plaintiff has not convinced me by a

---

[49] *See* Union Pacific Railroad Locomotive Engineer Job Description Brief, Ex. K; HealthMasters XRTS Functional Capacity Evaluation dated October 7, 2015, Ex. 47, p. 5 (lifting capacities inconsistent with demands of job as engineer; unable to tolerate sustained sitting); *see also supra* pp. 23–24 (describing Plaintiff's testimony on his physical limitations, pain medication, and inability to take security guard position due to pain medication).

preponderance of the evidence that anything beyond the chiropractic treatment he received for his neck was necessitated by the accident. Nor has he convinced me that his ongoing cervical complaints are related to the collision, or that he will need any future medical treatment for his neck as a result of the collision.

Nor am I convinced that Plaintiff's knee and shoulder injuries were caused by the accident. While I can appreciate how reacting to the impact—a sudden, involuntary, awkward movement—could strain a neck muscle or aggravate a herniated disc, the evidence introduced at trial did not convince me that it could cause bilateral shoulder impingement syndrome *and* bilateral meniscal tears in the knees. Assuming Plaintiff's body collided with the console and the back of the cab, I am not convinced that those impacts were sufficiently violent to have caused bilateral shoulder impingement syndrome and bilateral meniscal tears. What evidence is there to connect Plaintiff's knee and shoulder complaints to the accident? Granted, there is a temporal relationship. He was asymptomatic prior to the accident and became symptomatic shortly thereafter. But that is not enough to establish causation. *See, e.g.*, *Goebel*, 346 F.3d at 999 ("The court is not permitted to . . . rely on the temporal relationship by itself as evidence of causation."); *Etherton*, 35 F. Supp. 3d at 1367. In contrast to the lower back (where there was no evidence of pain prior to the accident, a particular type of pain afterward, and radiologic and intraoperative findings explaining that pain), there is nothing to tie the knee and shoulder pain to the accident other than the fact that Plaintiff first reported the pain shortly after the accident. Plaintiff had the burden of proving every essential element of his claim—including causation— by a preponderance of the evidence. It was his burden to convince me that it was more likely true than not that his knee and shoulder injuries were caused by the accident. *See* UJI 13-304 NMRA

(Burden of proof; greater weight of the evidence).[50] He has not met that burden with respect to the knee and shoulder injuries.

I reviewed Dr. Freeman's and Dr. Romagosa's testimony, searching for any scientifically sound, persuasive expert testimony supporting causation on the knee and shoulder injuries. Finding none, I reject their testimony on those issues. UJI 13-213 NMRA ("After considering the reasons stated for [an expert's] opinion, you should give it such weight as it deserves. You may reject an opinion entirely if you conclude that it is unsound."); *Chapman v. Jesco, Inc.*, 1982-NMCA-144, ¶ 3, 98 N.M. 707 ("The fact finder may reject expert opinion evidence in whole or in part.").

**Damages**

I will award damages for past wage loss and loss of future earning capacity. Plaintiff stipulated at trial that he could return to a light duty job if he could find one. Accordingly, I will offset Plaintiff's loss of future earning capacity by an amount that he could reasonably expect to earn in the future given his training, education, transferable skills, and any additional training he can reasonably expect to obtain. Plaintiff testified that he has attempted to find work with multiple employers where he lives, but he has been unable to obtain employment within his medical and functional limitations. I accept the alternative employment figures used by Dr. McCoin in his economic loss analysis and will award Plaintiff $1,832,519 for loss of future earning capacity.

---

[50] I am not saying it is impossible that his knee and shoulder complaints are related to the accident. Nor, I wish to make clear, do I believe Plaintiff is malingering or exaggerating his injuries. Obviously, he has not made up the cervical disc herniations or the impingement syndrome in his shoulders or the meniscal tears in his knees. Those problems are real, and I have no doubt that he has suffered because of them. I am simply saying that he did not convince me by a preponderance of the evidence that they were caused by the accident.

I reject Defendant's argument that Plaintiff has failed to mitigate his damages by not pursuing the security officer position in Santa Rosa. *See Wilson v. Union Pac. R.R. Co.*, 56 F.3d 1226, 1232 (10th Cir. 1995) (trial court did not abuse its discretion by failing to give mitigation of damages instructions based on plaintiff's failure to interview for a security guard position that his doctor testified he could not have performed in any event). First, the law does not require an injured party to make *every* effort to mitigate damages; all that is required is that he undertake ordinary or *reasonable* measures. *Lovelace Med. Ctr. v. Mendez*, 1991-NMSC-002, ¶ 10, 111 N.M. 336; UJI 13-1811 NMRA ("[A]n injured person must exercise ordinary care to minimize or lessen his damages."). It would be unreasonable to expect Plaintiff to uproot his family, sell his house, and move 265 miles to take a job he has never performed before. Second, it is undisputed that Plaintiff occasionally has to take narcotic pain medications which disqualify him from taking that position. In any event, mitigation of damages is an affirmative defense on which Defendant bears the burden of proof. *McGinnis v. Honeywell, Inc.*, 1990-NMSC-043, ¶ 22, 110 N.M. 1. Defendant failed to meet that burden in this case.

With respect to past and future medical expenses, I have closely reviewed the medical records[51] and bills.[52] I have also reviewed Dr. Romagosa's testimony regarding future medical expenses. I will award the cost of the treatment at the emergency room on the day of the accident. I will award the cost of all past medical expenses and most of the future medical expenses related to the low back injury.[53] I will award the cost of the chiropractic care for the

---

[51] Exs. 22–48.

[52] Exs. 49–76.

[53] Dr. Romagosa's lifecare plan for Plaintiff included the cost of a two-level discectomy and fusion. Dr. Romagosa testified that patients like Plaintiff who have undergone lumbar fusion surgery "quite often have adjacent disc disease. It's usually much greater than 18 percent in people that have had a fusion." I found Dr. Romagosa's testimony on that issue to be speculative, conclusory, and unpersuasive. Accordingly, I have not awarded the cost of

cervical injury, but nothing beyond that for the neck. I will not award any past or future medical expenses related to the knee or shoulder injuries. I will award the cost of past and future psychological counseling and medications.

In many instances, it is easy to tell whether a particular treatment meets the above criteria: the lumbar fusion surgery is clearly related to the low back injury; the arthroscopic knee surgeries are not. The physical therapy ordered by Dr. Pacheco-Serrant following the fusion surgery is related to the low back injury; the physical therapy ordered by Dr. Alost for the knees and shoulders is not. In other instances, however, the distinction is not so clear. In such instances, where I cannot tell whether the treatment meets the above criteria, I have not awarded damages for that treatment. Plaintiff has the burden of proving every element of his claim, which means that it was his burden to prove that medical treatment was (or will be) related to the collision. Where I could not determine from the medical records and bills whether any particular treatment was related to the injuries I find were caused by the accident, I find that Plaintiff has failed to meet his burden of proof on that treatment.

I heard testimony from Plaintiff, his wife, his sister, and his coworkers about the impact his injuries have had on him. I found all of these witnesses to be credible regarding Plaintiff's pain and suffering. He is a relatively young man who has significant permanent restrictions that will affect not only his future job opportunities, but also his daily activities, his relationships with friends and family, and his enjoyment of life in general.

_____

that surgery.

On the basis of the foregoing, I find that Plaintiff is entitled to recover from Defendant the following damages:

Past medical expenses:                             $248,096.38

Future medical and related expenses:               $150,201.00

Past wage loss:                                    $186,424.00

Loss of future earning capacity:                 $1,832,519.00

Pain and suffering:                                $500,000.00

TOTAL:                                           $2,917,240.38

Plaintiff is also awarded costs under Fed. R. Civ. P. 54[54] and post-judgment interest[55] at the rate of 1.21% per annum from date of judgment until paid. 28 U.S.C. § 1961.

_____
**STEPHAN M. VIDMAR**
**United States Magistrate Judge**
**Presiding by Consent**

---

[54] *See* D.N.M.LR-Civ. 54 regarding motions for taxable costs.
[55] Plaintiff is not entitled to pre-judgment interest. 28 U.S.C. § 2674.